UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRUSTEES OF SHEET METAL WORKERS
LOCAL 7 ZONE 1 PENSION FUND, et al.,

    Plaintiffs,                                        Case No. 1:18-cv-1443

v.                                                   HON. JANE M. BECKERING

PRO SERVICES, INC.,

    Defendant.
_____/

## OPINION AND ORDER

This matter is before the Court on the parties' cross-motions for summary judgment (ECF Nos. 104 & 106). Plaintiffs in this case are the Trustees of Sheet Metal Workers Local 7 Zone 1 Pension Fund, Health and Welfare Fund, and the Joint Apprenticeship and Training Fund ("the Funds"), which are multi-employer trust funds established to provide benefits to employees. The Funds seek fringe benefit contributions from Defendant, Pro Services, Inc. ("Pro Services"), under the Labor Management Relations Act (LMRA), 29 U.S.C. § 141 et seq., and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. Pro Services maintains that it owes no benefit contributions to the Funds. At issue is whether the work performed by certain Pro Services employees constitutes covered work for purposes of payment obligations under the applicable collective bargaining agreement. For the following reasons, the Court denies the Funds' motion and grants Pro Services' motion.

### I.    BACKGROUND

Pro Services is a privately held industrial contractor based in Portage, Michigan, engaged

in the business of supplying labor. Pro Services began by supplying plumbers and pipefitters to its customers but expanded to supplying other skilled trades, including millwrights and sheet metal workers (VandeMaele Dep. at 13, ECF No. 107-5 at PageID.2851).

In 2009, Pro Services introduced Full-Service Maintenance Technicians ("FMTs"), employees trained by Pro Services who are contracted out to Pro Services' customers on a long-term basis to perform small-scale, routine maintenance work—"troubleshooting"—inside manufacturing facilities in order to keep production lines running (VandeMaele Dep. at 64-67, PageID.2852-2853). Pro Services' CEO, Michael VandeMaele, testified that Pro Services has never utilized FMTs to perform sheet metal work or work that would be performed by any skilled trades, such as carpenters, millwrights, iron workers, plumbers or pipe fitters (VandeMaele Dep. at 68, ECF No. 107-5 at PageID.2853). According to VandeMaele, an FMT is "strictly a maintenance mechanic" (*id.*). VandeMaele explained that the purpose of the FMT program was to provide Pro Services' customers with "help in maintenance, maintenance-related items that skilled tradespeople didn't want to do" (*id.* at 64, PageID.2852). Indeed, VandeMaele related that when a situation arose where Pro Services became aware that a customer was using FMTs to perform work that Pro Services considered to be "skilled trades work," Pro Services ended its relationship with that customer "on that day" (VandeMaele Dep. at 69, ECF No. 108-2 at PageID.2998).

The record contains testimony from other management-level employees at Pro Services similarly describing the bifurcated nature of Pro Services' business. Curt Petersen, Pro Services' president, described Pro Services' work as "industrial maintenance" and "construction contractor" (Petersen Dep. at 14-16, ECF No. 107-6 at PageID.2855). Petersen testified that the "industrial maintenance" side of Pro Services' business involved "cleaning," "troubleshooting" and "PMs"

(preventative maintenance tasks), like "replac[ing] some piping that's worn out" or "chang[ing] out valves" (*id.*). He testified that the skilled tradespeople employed by Pro Services mostly worked on the construction projects, "installing domestic waterlines, toilets, sinks" (*id.*). Specifically, according to Petersen, the work performed by the sheet metal workers that Pro Services employed was "all in" the building and construction industry (*id.* at 17, PageID.2856).

Jason Harloff, a "chief solutions officer" at Pro Services, similarly testified that he viewed Pro Services' business as having two distinct segments: skilled trades and maintenance technicians (Harloff Dep. at 21, ECF No. 107-7 at PageID.2859). He testified to his belief that "over the years," the maintenance technicians worked "only at industrial production plants" (*id.*).

A sales representative for Pro Services, Jeff Miller, testified that Pro Services delivers either "general maintenance talent" or "skilled trades opportunities" (Miller Dep. at 11, ECF No. 105-23 at PageID.2752). Miller testified that to the best of his knowledge, "all or almost all of Pro Services' work [is] in the manufacturing sector of business" (*id.*).

Last, Roy Lemke, a maintenance manager for Pro Services, testified that Pro Services' FMTs were employed in the "manufacturing industrial maintenance industry" (Lemke Dep. at 14, ECF No. 107-8 at PageID.2862). Lemke explained that an FMT is intended to be a "long-term employee at a manufacturing location" (*id.* at 39, PageID.2863), with "skill sets to support a little bit of everything to maintain … to keep equipment up and running" (*id.* at 41, PageID.2864). According to Lemke, the tasks that FMTs performed were "absolutely not" tasks that sheet metal workers would be performing (*id.* at 44, PageID.2864). Another maintenance manager for Pro Services, Jayme Wachowicz, similarly testified that sheet metal workers could not do an FMT's job (Wachowicz Dep. at 25-26, ECF No. 107-19 at PageID.2928).

The record also contains testimony from many of the FMTs describing their work.

Nicholas Glaspey testified that he was sent to work at a plant in Buffalo, New York to "take care of the machine, do the PMs and repairs" (Glapsey Dep. at 6-7, ECF No. 107-10 at PageID.2868). Glapsey testified that all of his work for Pro Services has been within a production or manufacturing facility and that he has not performed any construction work for Pro Services (*id.* at 17, PageID.2869). Zachary Selvidge and Austin Zapata, other FMTs employed by Pro Services, similarly testified that they had not performed any construction work for Pro Services (Selvidge Dep. at 37, ECF No. 107-11 at PageID.2871; Zapata Dep. at 35-36, ECF No. 107-16 at PageID.2886). More than thirty other FMTs similarly described the manufacturing facilities in which they were placed by Pro Services and the repairs they performed to keep the equipment at their respective facilities running (ECF Nos. 107-12 through 107-16, 107-24 & 107-26; Martin Dep. at 9-10, 13, ECF No. 111-2 at PageID.3300-3301, 3306; Hartwick Dep. at 19, ECF No. 105-11 at PageID.2551; Wright Dep. at 10, ECF No. 105-12 at PageID.2574; Martin Dep. at 10, 15, ECF No. 105-13 at PageID.2605, 2610; Jones Dep. at 13, ECF No. 105-14 at PageID.2624; Seward Dep. at 11, ECF No. 105-15 at PageID.2644; Valeron Dep. at 10-11, ECF No. 105-17 at PageID.2678-2679; and Welch Dep. at 10-11, ECF No. 105-18 at PageID.2692-2693).

The FMTs testified that to the extent they ever used sheet metal, they used it for a repair on "existing machines" (Wright Dep. at 11, ECF No. 105-12 at PageID.2575; Seward Dep. at 28-29, ECF No. 105-15 at PageID.2659-2660; Neibarger Dep. at 13-14, ECF No. 105-16 at PageID.2668-2669; Valeron Dep. at 12, ECF No. 105-17 at PageID.2680; Welch Dep. at 15, ECF No. 105-18 at PageID.2696; Trinidad Dep. at 19-20, 29-30, ECF No. 105-19 at PageID.2714-2715, 2723-2724), on an "as needed" basis (Hartwick Dep. at 25, 29-32, 49, ECF No. 105-11 at PageID.2556, 2560-2563, 2570). For example, the FMTs used sheet metal to "stich weld something where it tore" (Buchanan Dep. at 21-23, ECF No. 107-20 at PageID.2930-2931), to

4

repair a scrap chute to keep the production line moving (Horrall Dep. at 19, ECF No. 107-12 at PageID.2875), to weld a worn down metal guide to "get it in working order" (Sivley Dep. at 14-16, ECF No. 107-25 at PageID.2941), or to "build a trunk line … so that the X-ray machine would work properly" (Martin Dep. at 11-12, ECF No. 111-2 at PageID.3302-3303).

Pro Services belonged to the Five Cities Association of Michigan, which, on behalf of its members, is a party to a Collective Bargaining Agreement (CBA) with the International Association of Sheet Metal, Air, Rail, and Transportation Workers Local Union No. 7-Zone 1 ("SMART"). According to Pro Services, SMART describes its members as "unique in the construction industry as the only trade that designs, manufactures and installs our own products. These skilled craftspersons take ordinary types of flat metal and make them into specialized products for various duct and ventilation systems, as well as architectural and specialized metal fabrication. Members of the trade are proud of its special distinction: They not only build; they create" (ECF No. 107 at PageID.2781, quoting https://smart-union.org/sheet-metal/ (last accessed on September 30, 2021)).

The CBA at issue in this case is entitled "STANDARD FORM OF UNION AGREEMENT—Sheet Metal, Roofing, Ventilating and Air Conditioning Contracting Divisions of the Construction Industry" (CBA at 1).[1] As noted, the CBA establishes three funds: the "Sheet Metal Workers Local 7 Zone 1 Pension Fund," the "Sheet Metal Workers Local 7 Zone 1 Health and Welfare Fund," and the "Sheet Metal Workers Local 7 Zone 1 Five Cities Association Joint Apprenticeship and Training Fund" (CBA at 24-27). Under the terms of the CBA and the trust documents that are incorporated by reference, signatory employers such as Pro Services agree to contribute to the Funds for work performed by its employees that falls within the CBA's "Trade

---

[1] The parties filed duplicative exhibits in this case. The CBA can be found in the record at ECF No. 107-3 (Pro Services' Exhibit B), among other locations.

Jurisdiction." The Trade Jurisdiction is described in the CBA as the following:

> (a) manufacture, fabrication, assembling, handling, erection, installation, dismantling, conditioning, adjustment, alteration, repairing and servicing of all ferrous or nonferrous metal work and all other materials used in lieu thereof and of all air veyor systems, exhaust systems, and air-handling systems regardless of material used including the setting of all equipment and all reinforcements in connection therewith; (b) all lagging over insulation and all duct lining; (c) testing and balancing of all air-handling equipment and duct work; (d) the preparation of all shop and field sketches whether manually drawn or computer assisted used in fabrication and erection, including those taken from original architectural and engineering drawings or sketches; (e) operation of all automated or computer controlled fabricating equipment in the shop[;] (f) metal roofing; and (g) all other work in the jurisdictional claims of International Association of Sheet Metal, Air, Rail and Transportation Workers.

(CBA at 1).

In August 2018, Stefansky, Holloway & Nichols, Inc., a payroll auditing firm, sent Pro Services a letter delineating the results of its audit for the time period January 2013 through March 2016 and concluding that Pro Services owed approximately $3.4 million to the Funds in delinquent contributions to the Sheet Metal Workers' International Association Local 7–Zone 1, as well as associated damages (8/17/2018 Audit letter, ECF No. 107-2 at PageID.2805). In November 2019, the firm sent Pro Services another letter delineating the results of its audit for the time period April 2016 through March 2019 and concluding that Pro Services also owed approximately $4.5 million and damages (11/22/2019 Audit letter, ECF No. 107-2 at PageID.2811). VandeMaele testified that Pro Services had not previously been informed that it was obligated to the Funds for work that the FMTs were performing (VandeMaele Dep. at 69, ECF No. 108-2 at PageID.2998).

Charles Nichols, one of the payroll auditors, testified that when his firm began the audit of Pro Services, the firm was proceeding under the assumption that the FMTs were performing covered work and that the firm did not gather any information to confirm the assumption (Nichols Dep. at 25-28, ECF No. 107-17 at PageID.2918). Nichols testified that his firm's focus was not to determine whether an FMT was performing covered work but the accuracy of the hours and

rates (*id.* at 29-30, PageID.2919). Indeed, Nichols testified that he does not know what work an FMT performs and could not describe an FMT's job functions (*id.*).

In December 2018, the Trustees of the Funds filed this action, seeking approximately $8 million in allegedly delinquent fringe benefit fund contributions and liquidated damages for FMT hours worked from January 2013 through March 2019 as a result of the payroll audits of Pro Services' employees.[2] In October 2021, the Funds filed their Motion for Partial Summary Judgment (ECF No. 104), to which Pro Services filed a response in opposition (ECF No. 108) and the Funds filed a Reply (ECF No. 112). Pro Services, in turn, moved for summary judgment in its favor (ECF No. 106). The Funds filed a response in opposition to Pro Services' motion (ECF No. 111), and Pro Services filed a Reply (ECF No. 116). The motions were fully briefed on November 24, 2021. On January 5, 2022, this case was reassigned from the Honorable Paul. L. Maloney to the undersigned (ECF No. 118).

## II.     ANALYSIS

### A.     Motion Standard

The parties' motions are filed pursuant to FED. R. CIV. P. 56. A party may move for summary judgment, identifying each claim on which summary judgment is sought. FED. R. CIV. P. 56(a). Summary judgment is proper "if the movant shows that there is no genuine dispute as to

---

[2] This case was previously consolidated with *Michigan Regional Council of Carpenters Employee Benefits Fund, et al. v. Pro Services, Inc.*, No. 1:18-cv-1300. Pro Services has also long belonged to the West Michigan Contractors Association, which, on behalf of its members, is party to its own collective bargaining agreement (the "Millwright CBA") with the Union. Like the CBA at issue in this case, the Millwright CBA requires employers to contribute to certain funds for all hours worked by employees covered by the Millwright CBA and performing work within the Millwright CBA's work jurisdiction provision. In February 2020, Pro Services moved for summary judgment of the Millwrights' claims against it. In resolving the motion, this Court observed that "[t]his case is, at bottom, a dispute over whether and to what extent FMTs perform work within the work jurisdiction provision of the Millwright CBA" (Op. & Order, ECF No. 70 at PageID.2132). The Court determined that "[t]here is no way for the Court to conclude, based on the evidence before it, how many hours were spent on covered work in the relevant time period" (*id.* at PageID.2146). Because genuine questions of material fact remained for resolution at trial, the Court denied Pro Services' motion for summary judgment. The parties reached a settlement the following month, and the case closed on October 23, 2020.

any material fact and the movant is entitled to judgment as a matter of law." *Id.*

In resolving a motion for summary judgment, a court must consider the evidence and all reasonable inferences in favor of the nonmoving party. *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013); *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citation omitted). The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010). The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "There is no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Burgess*, 735 F.3d at 471 (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The function of the court is not "'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (quoting *Anderson*, 477 U.S. at 249). "The ultimate inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sierra Brokerage Servs.*, 712 F.3d at 327 (quoting *Anderson,* 477 U.S. at 251-52).

### B. Discussion

In support of summary judgment in its favor, Pro Services asserts that the Funds' Complaint is "ill-conceived" because the Complaint ignores the express language in the title of the CBA, which indicates that the CBA applies only to specified types of work in the "construction industry," and it is undisputed that FMTs do not work in the construction industry; rather, FMTs work exclusively as technicians for customers in the manufacturing industry (ECF No. 106 at

8

PageID.2771; ECF No. 107 at PageID.2794). Pro Services points out that nowhere in the CBA is there any language stating that the CBA's title is only included for convenience or should be disregarded (ECF No. 107 at PageID.2780). According to Pro Services, because the CBA does not apply to work performed by FMTs, Pro Services has no payment obligation (ECF No. 106 at PageID.2771). Pro Services indicates that it has "taken the CBA's title literally—when it employed sheet metal workers, they worked exclusively in the construction industry" (ECF No. 107 at PageID.2780-2781).

In response, the Funds argue that Pro Services' motion should be denied because the CBA's Trade Jurisdiction provision "unequivocally" covers "all employees of the Employer engaged in but not limited to the . . . manufacture, fabrication . . . dismantling, conditioning, adjustment, alteration, repairing and servicing of all ferrous and nonferrous metal work and all other materials used in lieu thereof and of all air veyor systems," which would necessarily include work FMTs performed on the "ever changing factory floor" (ECF No. 111 at PageID.3280). The Funds contend that FMTs may fabricate metal and repair and create new machine guards on equipment, repair, configure, and install conveyor systems, and repair and redesign air veyor systems when working on factory equipment (ECF No. 111 at PageID.3280). The Funds characterize Pro Services' contrary interpretation of the CBA as "strained" and "nothing more than a desperate attempt to escapes [sic] liability" (*id.* at PageID.3283).

Further, the Funds seek partial summary judgment in their favor on the following three facts: (1) "Pro Services was a party to the collective bargaining agreements"; (2) "Pro Services violated the collective bargaining agreements by using nonunion employees (FMTs) to do work covered under the CBA"; and (3) "Pro Services has no records from which it can be determined the work performed by MFTs [sic]" (ECF No. 105 at PageID.2397). The Funds argue that

9

deciding these three issues as a matter of law will narrow the issues to damages, interest and attorney fees, which would be decided at a later date (*id.*). According to the Funds, the deposition of the various FMTs employed by Pro Services demonstrates they consistently and repeatedly performed covered work (*id.* at PageID.2395-2396). The Funds argue that Pro Services' "deliberate ignorance" of the FMTs' work is not a defense; rather, Pro Services' failure to maintain records of the work that FMTs perform creates a presumption that "all of the work was covered under the collective bargaining agreements" (*id.* at PageID.2396).

In response, Pro Services argues that the Funds' motion is premised upon violations of basic contract interpretation rules, a misapplication of the "*Grimaldi* Rule,"[3] and a flawed, unreliable audit (ECF No. 108 at PageID.2971). On the former point, Pro Services contends that because its FMTs did not perform covered labor, Pro Services was not required to keep records on such employees (*id.* at PageID.2985-2988). On the latter points, Pro Services opines that the Funds' evidence amounts to "mere conjecture," which is not sufficient to shift the burden to Defendant as a matter of law (*id.* at PageID.2988).

The Court has determined that the arguments Pro Services makes in its motion have merit and are outcome-determinative.

"When collective-bargaining agreements create pension or welfare benefits plans, those plans are subject to rules established in ERISA." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 434 (2015). A "core functional requirement[ ]" of ERISA is that each "employee benefit plan shall be established and maintained pursuant to a written instrument." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (quoting 29 U.S.C. § 1102(a)(1)). Written agreements

---

[3] In *Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692 (6th Cir. 1994), the Sixth Circuit held that once the funds produce evidence that an employer is not making contributions to the funds as required by its CBA, the burden shifts to the employer to produce records showing that the work performed was not within the union's craft jurisdiction. *Wilson v. DM Excavating, LLC*, 844 F. App'x 827, 832 (6th Cir. 2021).

must "specify the basis on which payments are made to and from the plan," 29 U.S.C. § 1102(b)(4), and "[t]he plan administrator is obliged to act 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with'" ERISA provisions. *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 300 (2009) (quoting 29 U.S.C. § 1104(a)(1)(D)). "Written agreements lend certainty and predictability to employee benefit plans, and this in turn serves the interests of employers and employees." *Operating Engineers Loc. 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1051 (6th Cir. 2015) (citing *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 402 (6th Cir. 1998) (en banc)).

"The writing requirement is reinforced by Section 302 of the LMRA, 29 U.S.C. § 186." *Id.* at 1051. The LMRA bars an employer from contributing to benefit trusts designated by employee representatives unless the payments are "made in accordance with a written agreement with the employer." *Id.* (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Behnke, Inc.*, 883 F.2d 454, 459 (6th Cir. 1989) (citing 29 U.S.C. § 186(c)(5)(B))). "Written agreements are required to prevent misappropriation or dissipation of monies that are owed to the employees." *Id.*

Section 515 of the ERISA specifically provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. The Sixth Circuit Court of Appeals has held that "[t]his provision entitles multiemployer plans to rely on the literal terms of written commitments between the plan, the union, and the employer and, as a result, the actual intent or understanding of the contracting parties is immaterial when the meaning of that language is clear." *Trustees of B.A.C. Loc. 32 Ins.*

*Fund v. Ohio Ceiling & Partition Co.*, 48 F. App'x 188, 192 (6th Cir. 2002). "ERISA funds are not entitled to enforce a nonexistent contractual obligation." *Id.* (citation omitted).

Whether a contractual provision is ambiguous is a question of law for the court to determine. *Id.* Collective bargaining agreements that establish ERISA plans are interpreted by use of "ordinary contract principles, at least when those principles are not inconsistent with federal labor policy." *M & G Polymers*, 574 U.S. at 435 (citing *Textile Workers v. Lincoln Mills of Ala.*, 353 U.S. 448, 456-457 (1957)). "[T]he substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws." *Textile Workers Union of Am.*, 353 U.S. at 456. "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *M & G Polymers, supra* (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012) (internal quotation marks omitted)).

As the Court of Appeals for the Second Circuit has held, "[c]aptions are relevant to contract interpretation." *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 85 (2d Cir. 2002) (explaining that contracts must be "read as a whole, including any introductory clause or heading, to determine the intent of the parties"). *See, e.g., Ward v. TheLadders.com*, 3 F. Supp. 3d 151 (S.D.N.Y. 2014) (citing *Int'l Multifoods* for the proposition that the heading "Disclaimer of Warranties" must be "considered and given effect in contractual construction"); *Pentech Pharms., Inc. v. Par Pharm., Inc.*, 597 F. Supp. 2d 758, 784 (N.D. Ill. 2009) (citing *Int'l Multifoods* for the proposition that "[t]he title of Article 5—'Payment For The Product'—is significant"). And, as Pro Services points out, there is no provision in the CBA indicating that the title should be disregarded. *Contrast Jenkins v. U.S.A. Foods, Inc.*, 912 F. Supp. 969, 975 (E.D. Mich. 1996) (disregarding the caption in the contract because the parties' agreement included a section that

"indicates that such titles and headings are inserted strictly for convenience and are not to affect the interpretation of the contract").

Within the specific context of a collective bargaining agreement, the Court of Appeals for the Fifth Circuit held that an arbitrator's award conflicted with "the plain language of the CBA" where the "arbitrator's interpretation failed to account for … the CBA's title page that sets February 19, 2016 through February 18, 2021 as the 'period' for the CBA[.]" *Sw. Airlines Co. v. Loc. 555, Transp. Workers Union of Am. AFL-CIO*, 912 F.3d 838, 846 (5th Cir. 2019).

In *Trustees of the Painters, Union Deposit Fund v. G & T Com. Coatings, Inc.*, No. 13-CV-13261, 2014 WL 4658414, at *11 (E.D. Mich. Sept. 17, 2014), an action for unpaid fringe benefit contributions, the district court was likewise faced with the question "who is an 'employee' who is 'covered by this Agreement'?" The court determined that the answer was found in the CBA, specifically, the category of workers described therein. *Id.* However, the court reasoned that "the class of workers for whom fringe benefit contributions must be made pursuant to the fringe benefit clause is limited by the title of the clause," to wit: "Fringe Benefit Contribution Rate For Commercial, Industrial Painters," which the court held "clarifies that fringe benefit contributions under that particular provision of the CBA are only required for 'Commercial, Industrial Painters.'" *Id.* The court concluded that the fringe benefit clause, requiring fringe benefit contributions for all hours worked by "employees" who are "covered by this Agreement," included the described employees, "subject to the limitation that contributions are only required under the fringe benefit clause for employees who are 'commercial, industrial painters.'" *Id.*

Here, the title of the parties' CBA expressly identifies the "Sheet Metal, Roofing, Ventilating and Air Conditioning Contracting Divisions of the Construction Industry" and therefore limits the class of workers for whom fringe benefit contributions must be made. The title

13

is clear on its face that the CBA applies to employees performing covered work in the "construction industry" and does not encompass employees performing covered work in other industries. In fact, the Funds have not pointed to any ambiguities in the language, opining only that Pro Services relies on the title in order to escape financial liability. However, the Funds' argument would have this Court simply ignore the title, whereas the Supreme Court has instructed that "the rule that contractual 'provisions ordinarily should be enforced as written is especially appropriate when enforcing an ERISA [welfare benefits] plan.'" *M & G Polymers*, 547 U.S. at 435 (citation omitted).

The Funds also do not advance the argument that FMTs work "in the construction industry." And the fact that FMTs may incidentally handle or repair a ferrous or nonferrous metal part or a positive pressure conveyer in the course of maintaining factory floor equipment does not convert their work to construction. As noted by Pro Services, while a person can perform construction work at manufacturing facility, such as when building new facilities, renovating, or expanding existing buildings, such work remains in the nature of construction, whereas troubleshooting and repair maintenance at a manufacturing plant is operational in nature and designed to keep production lines running.

Again, an employer's obligation to make contributions to a multi-employer fringe benefit fund is governed by the terms of the relevant CBA, 29 U.S.C. § 1145, and the CBA in this case, by its own literal terms, imposes a payment obligation for employees performing covered work in the construction industry. "ERISA funds are not entitled to enforce a nonexistent contractual obligation." *Trustees of B.A.C. Local 32 Ins. Fund,* 48 F. App'x at 192. In short, the CBA does not impose on Pro Services the payment obligation that the Funds allege in this case.

Consequently, the Court need not address the parties' remaining arguments for summary judgment in their favor.

### III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (ECF No. 104) is DENIED.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 106) is GRANTED.

Dated:  March 30, 2022                                       /s/ Jane M. Beckering
                                                             JANE M. BECKERING
                                                             United States District Judge